IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-378

Filed 3 October 2023

Mecklenburg County, No. 20 CVD 7320

KIMBERLY KLEIN, Plaintiff,

v.

GARY KLEIN, Defendant.

Appeal by defendant from order and judgment entered 8 October 2021 and orders entered 10 January 2022 by Judge Tracy H. Hewett in District Court, Mecklenburg County. Heard in the Court of Appeals 10 January 2023.

> *James, McElroy & Diehl, P.A., by Preston O. Odom, III and Haley E. White, for plaintiff-appellee.*
>
> *Law Office of Thomas D. Bumgardner, PLLC, by Thomas D. Bumgardner, for defendant-appellant.*

STROUD, Chief Judge.

Defendant-husband appeals from three orders. The first order and judgment grants equitable distribution, awards child support to plaintiff-wife, and awards alimony to plaintiff-wife. The other two orders distribute specific retirement plans and were entered after defendant-husband's notice of appeal from the first order. For the reasons below, we affirm the judgment and order and two orders regarding retirement plans.

## I. Background

Defendant-husband ("Husband") and plaintiff-wife ("Wife") were married on 29 October 2005. During the parties' marriage, the parties had one child, David,[1] who was born in 2012. During the marriage, Husband practiced as a physician, having obtained his license in 1992. Up until 2011, Husband alternated employment with private healthcare companies and federal agencies, and from 2011 onward Husband was employed primarily as a physician with the Department of Defense. Wife is self-employed and a business owner, and since 2014 has worked on a part time basis while caring for David. "Throughout the marriage[,]" Husband provided the primary financial support for the family.

In April 2020, Wife's uncle, whom she considered and referred to as her father, passed away. Wife wanted to provide support to her aunt, "whom she considers her mother and [David's] grandmother[,]" who was living in Virginia. Wife wanted to travel to visit her aunt, but Wife and Husband disagreed about whether Wife should be able to travel to Virginia with David. Wife wanted to take David with her to Virginia to maintain his home-schooling, and Husband was scheduled to fly out of state in early May for an undetermined length of time. However, Husband generally refused to discuss the possibility of Wife travelling to see her aunt. Wife, upset by Husband's unwillingness to discuss the matter, the death of her uncle, and some other circumstances of the parties' marriage, decided to travel to Virginia regardless.

---

[1] A pseudonym is used.

On 22 April 2020, while Husband was at work, Wife left for Virginia with David. Wife also left a letter on Husband's desk, letting him know that she and David were on their way to Virginia, "expressing her unhappiness with their marriage, and outlining the issues that both parties needed to work on in order to attempt to save their marriage." Wife's letter "was not an intention to separate but clearly spelled out the possibility of continuing to work on the marriage." Wife said in her letter that she was "not abandoning [Husband] and [she was] not going [to Virginia] for a long time." Wife's letter "gave no indication that [Wife] was abandoning [Husband] and taking the minor child." Husband and Wife spoke on the phone twice on 22 April 2020, and during these conversations, Husband confirmed he received Wife's letter.

While Wife and David were in Virginia, supporting Wife's aunt and planning her uncle's funeral, Wife received a letter from an attorney representing Husband which "accus[ed] [Wife] of absconding with [David] and threaten[ed] to seek emergency custody." Husband had not indicated to Wife during the 22 April 2020 phone calls that he believed Wife had absconded with David. Aside from alleging Wife absconded with David, the letter from Husband's attorney also stated "[u]pon [Wife's] return, it is [Husband's] desire to begin the separation process." Wife retained an attorney in Virginia and through counsel informed Husband she would be returning to Charlotte with David after her uncle's funeral. At some point in early May, Husband vacated the marital home, and Wife returned to the home with David.

On 26 May 2020, Wife filed a complaint in District Court, Mecklenburg County,

alleging claims for temporary and permanent child custody, temporary and permanent child support, postseparation support, alimony, equitable distribution including an unequal share of the marital property and an interim distribution, and attorney's fees. Wife alleged the parties separated on 23 April 2020 "when [Husband] expressed his desire to separate while" Wife and David were in Virginia, as discussed above. Wife also alleged a pattern of marital misconduct, including sexual misconduct, by Husband. On 15 June 2020, Husband filed a motion to change venue from Mecklenburg County to Union County and an answer to the complaint. Among other things, Husband denied that he initiated the parties' separation but admitted that a dispute had arisen between the parties. Husband also denied any allegations of marital misconduct and denied Wife was entitled to alimony, an unequal distribution of the marital property, an interim distribution, or postseparation support. Husband asserted counterclaims for child custody, equitable distribution, and attorney's fees. Husband later voluntarily dismissed his motion for change of venue.

On 1 October 2020, the trial court entered a consent order resolving the parties' claims for postseparation support, temporary child support, temporary child custody, and an interim distribution ("Consent Order"). The Consent Order awarded joint legal custody of David, with Wife having primary physical custody and Husband secondary physical custody of David. The Consent Order directed Husband to pay Wife $1,373.46 per month in child support and $3,900 per month in postseparation

support, to continue providing medical insurance for David and Wife, and to pay child support and postseparation support arrears of $23,806.24. The Consent Order also directed Husband to pay Wife an interim distribution of $65,000, pay the parties' joint 2019 income tax liabilities, and reserved the issue of attorney's fees.

The claims for child custody, child support, equitable distribution, and alimony were heard 14 June 2021 through 16 June 2021. The trial court entered a written order on 8 October 2021 ("First Order"). The First Order (1) granted primary legal and physical custody of David to Wife and secondary physical custody to Husband, (2) ordered Husband to pay Wife $1,166.62 per month in child support pursuant to the North Carolina Child Support Guidelines, (3) ordered Husband to pay Wife $3,685.25 per month in alimony from 14 June 2021 until 14 June 2028, and (4) equitably distributed the parties' marital property. The First Order included an attached Child Support Guideline Worksheet showing the calculation of child support and an exhibit summarizing the equitable distribution of the parties' marital property. As to Husband's two federal retirement accounts, the trial court specifically reserved distribution of these accounts for entry of two additional court orders, a "Court Order Acceptable for Processing" and a "Qualifying Retirement Benefits Court Order."[2]

---

[2] The trial court reserved distribution of Husband's Thrift Savings Plan through a "Qualified Retirement Benefits Court Order," but later titled the order distributing Husband's retirement plan as a "Retirement Benefits Court Order."

Husband filed notice of appeal from the First Order on 22 October 2021. The trial court entered the two orders distributing Husband's federal retirement accounts on 10 January 2022 and Husband filed separate notices of appeal from each of the orders regarding retirement accounts on 7 February 2022.

## II.     Jurisdiction

Since the First Order did not entirely dispose of the parties' claims, we must first consider whether it is an interlocutory order and whether this Court has jurisdiction to consider the appeal. The First Order fully resolved the claims of child custody, child support, and alimony, but it did not fully resolve the equitable distribution claims. As to Husband's two retirement plans, in the other two orders, the trial court identified the plans, classified the plans, and directed the division of the plans but did not complete the distribution of the plans. Instead, the First Order noted that the trial court would enter two additional orders to bring about the division of the retirement plans, specifically a "Court Order Acceptable for Processing" for Husband's Federal Employees Retirement System Pension and a "Qualifying Retirement Benefits Court Order" for Husband's Thrift Savings Plan. Thus, the First Order is an interlocutory order, as it did not fully dispose of the case "but leaves it for further action by the trial court in order to settle and determine the entire controversy." *Veazey v. City of Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950).

> Generally, there is no right to appeal from an interlocutory order." *Flitt v. Flitt*, 149 N.C. App. 475, 477, 561 S.E.2d 511, 513 (2002) (citations omitted). However, in 2013, our

General Assembly enacted section 50-19.1, which provides:

> Notwithstanding any other pending claims
> filed in the same action, a party may appeal
> from an order or judgment adjudicating a
> claim for absolute divorce, divorce from bed
> and board, child custody, child support,
> alimony, or equitable distribution if the order
> or judgment would otherwise be a final order
> or judgment within the meaning of [Section]
> 1A-1, Rule 54(b), but for the other pending
> claims in the same action.

N.C. Gen. Stat. § 50-19.1 (2015).

*Kanellos v. Kanellos*, 251 N.C. App. 149, 151-52, 795 S.E.2d 225, 228 (2016) (emphasis removed).

All the claims in this case fall under the scope of North Carolina General Statute § 50-19.1, which allows immediate appeal of an order which is final as to some claims but not as to other claims in the same action. *See* N.C. Gen. Stat. § 50-19.1 (2021). The First Order was a final and immediately appealable order as to the claims of child custody, child support, and alimony, and Husband timely appealed within thirty days of entry of the First Order. *See* N.C. R. App. P. 3 (noting appeals must be made within 30 days). Husband's appeal from the First Order as to the claims of child support and alimony is properly before this Court under North Carolina General Statute § 50-19.1. *See* N.C. Gen. Stat. § 50-19.1.

But the First Order was not a final, appealable order as to the claim of equitable distribution and Husband's first notice of appeal did not deprive the trial

court of jurisdiction to enter the additional orders distributing the retirement plans. The First Order specifically directed that the trial court would enter two additional orders distributing Husband's federal retirement plans:

> 164. . . . [Husband's] interest in the FERS Pension is a marital asset. [Wife] shall be distributed and assigned a share of [Husband's] benefits under the FERS . . . *by means of a Court Order Acceptable for Processing ("COAP").*
> . . . .
>
> 165. [Husband] is a participant in the Thrift Savings Plan . . . . From this account, [Wife] shall be distributed fifty percent (50%) of the account balance . . . . [*Wife's*] *share of the account shall be distributed to her via a Qualifying Retirement Benefits Court Order ("QRBCO") prepared by* [*Wife's*] *attorney.*

(Emphasis added.) Despite Husband's appeal filed on 22 October 2021, the trial court retained jurisdiction to complete its adjudication of the equitable distribution claims under North Carolina General Statute § 50-19.1: "An appeal from an order or judgment under this section *shall not deprive the trial court of jurisdiction over any other claims pending in the same action*." N.C. Gen. Stat. § 50-19.1 (emphasis added).

The equitable distribution claim remained "pending in the same action" and the trial court was not deprived of jurisdiction over the equitable distribution claim by Husband's appeal of the First Order. *See* N.C. Gen. Stat. § 50-19.1 The trial court still had jurisdiction to enter the two orders distributing Husband's retirement plans. Husband also filed notice of appeal from these two orders within thirty days of entry

of the orders, so Husband's appeal from the two retirement plan orders is properly before this Court. *See* N.C. R. App. P. 3.

### III. Equitable Distribution

We first note Husband's brief raises an unusual number of issues. Although he summarizes his arguments in five "Issues Presented" in the brief, these broad statements of the issues actually contain at least fifteen sub-issues, touching on nearly every aspect of the equitable distribution, alimony, and child support portions of the First Order. We have attempted to address each argument for which Husband has presented a cognizable argument based upon the record and legal authority. *See* N.C. R. App. P. 28. We will begin with Husband's challenges to the portion of the First Order regarding equitable distribution.

### A. Standard of Review

This Court reviews the trial court's First Order and two orders regarding retirement to determine if "there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment. The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary." *Stovall v. Stovall*, 205 N.C. App. 405, 407, 698 S.E.2d 680, 683 (2010) (citation omitted). "The trial court's unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal." *Peltzer v. Peltzer*, 222 N.C. App. 784, 787, 732 S.E.2d 357, 360 (2012) (citation omitted).

"A trial court's determination that specific property is to be characterized as marital, divisible, or separate property will not be disturbed on appeal if there is competent evidence to support the determination." *Hill v. Hill*, 244 N.C. App. 219, 224, 781 S.E.2d 29, 34 (2015) (quotation marks omitted).[3] "The classification of property in an equitable distribution proceeding requires the application of legal principles, and we therefore review *de novo* the classification of property as marital, divisible, or separate." *Green v. Green*, 255 N.C. App. 719, 724, 806 S.E.2d 45, 50 (2017) (quotation marks omitted).

The equitable distribution award is reviewed for an abuse of discretion:

> A trial court is vested with wide discretion in family law cases, including equitable distribution cases. Accordingly, a trial court's ruling in an equitable distribution award . . . will be disturbed only if it is so arbitrary that [it] could not have been the result of a reasoned decision.

*Wright v. Wright*, 222 N.C. App. 309, 311, 730 S.E.2d 218, 220 (2012) (brackets in original) (citations and quotation marks omitted). "Only a finding that the judgment was unsupported by reason and could not have been a result of competent inquiry, or a finding that the trial judge failed to comply with the statute, will establish an abuse of discretion." *Wiencek-Adams v. Adams*, 331 N.C. 688, 691, 417 S.E.2d 449, 451 (1992) (citations omitted).

---

[3] This case is named "*Hill v. Sanderson*, 244 N.C. App. 219, 781 S.E.2d 29 (2015)" in Westlaw and the South Eastern Reporter, but "*Hill v. Hill*, 244 N.C. App. 219, 781 S.E.2d 29 (2015)" in the North Carolina Court of Appeals Reports. Therefore, we will refer to this case as "*Hill v. Hill*, 244 N.C. App. 219, 781 S.E.2d 29 (2015)."

## B. Analysis

Husband argues the trial court made numerous errors in classification and distribution of the parties' marital property. North Carolina General Statute § 50-20 governs the equitable distribution of marital and divisible property. *See* N.C. Gen. Stat. § 50-20 (2021). "Under N.C.G.S. § 50-20(c), equitable distribution is a three-step process; the trial court must (1) determine what is marital and divisible property; (2) find the net value of the property; and (3) make an equitable distribution of that property." *Watson v. Watson*, 261 N.C. App. 94, 97, 819 S.E.2d 595, 598 (2018). "Furthermore, in doing all these things the court must be specific and detailed enough to enable a reviewing court to determine what was done and its correctness." *Id.*

Husband specifically challenges several findings of fact and alleges six errors the trial court committed when classifying and distributing the parties' property. Husband argues the trial court (1) erred by misclassifying a familial gift of money as a loan and distributing the marital debt to Husband; (2) erred by misclassifying a gift of money by Husband to his colleague as a loan and distributing the "loan[;]" (3) erred by distributing one of Wife's retirement accounts to Wife as separate property because Wife failed to sufficiently trace the funds, and "[t]he entire contents of the account were marital[;]" (4) erred by classifying the proceeds of a lawsuit as marital property instead of distributing those proceeds to Husband in full as his separate property; (5) erred by failing to credit Husband for postseparation payments Husband made on the parties' mortgage and joint tax liability and for Wife's $65,000 interim distribution;

and (6) erred by distributing Husband's federal retirement benefits because the trial court lacked subject matter jurisdiction to enter subsequent orders after Husband filed his first notice of appeal.

### 1. *Familial Loan*

Husband first challenges finding of fact 170 as "not supported by competent evidence." (Capitalization altered.) Finding of fact 170 states:

> 170. **Loan for Purchase of [the Marital Home]:**
>
> a. In 2011, [Wife] and [Husband] desired to purchase a home located at . . . . They were unable to obtain a mortgage on their own, so [Wife's] aunt and uncle ("the Kellys") agreed to purchase the house for the parties. The Kellys, [Husband], and [Wife] agreed that [Husband] and [Wife] would lease the house from the Kellys and pay the monthly mortgage payments until they were able to purchase the house from them. The Kellys paid a down payment of $110,000.00 for the purchase of the . . . home. [Wife's aunt] and [Husband] agreed that [Husband] would repay the $110,000.00 down payment shortly after the purchase of the . . . home.
>
> b. After leasing the house for three (3) years, the parties desired to purchase the house from the Kellys, but **[Husband] said they could not purchase the house for fair market value, so the Kellys and [the parties] agreed that the parties could purchase the . . . residence for the original purchase price and the Kellys gifted the equity of $84,000.00 to [Wife], [Husband], and the minor child.**
>
> c. Unbeknownst to [Wife], the $110,000.00 loan for the down payment was never repaid to the Kellys.
>
> d. [Wife] contends the $110,000.00 loan is a debt subject to equitable distribution.

   e. **[Husband] initially contended that the $110,000.00 was a gift from the Kellys and not subject to equitable distribution.  [Husband] testified that he never told anyone that he would pay back the $110,000.00.**  However, [Wife] introduced an email from the mortgage lender to Mrs. Kelly which stated: "*I talked to* [*Husband*] *after talking with you.  He would be prepared to repay you the monies you will have to expend for the down payment and closing costs (as evidenced on the attached Itemized Fee Worksheet).  He could give these monies to you immediately after closing.*"

   f. **The Court finds [Husband's] contention that the $110,000.00 was a gift is not credible.**

   g. **[Husband] testified that he has a moral obligation to repay the $110,000.00 loan, but not a legal obligation because the loan was not memorialized in writing.**

   h. **[Husband] ultimately changed his testimony and testified that the $110,000.00 from the Kellys was a loan.**

   i. The Court finds that the $110,000.00 loan from the Kellys is a marital debt that should be distributed to [Wife].

(Bolding added, italics in original).

We first note that subsections (a) through (h) of finding 170 are findings of fact. "The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary."  *Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683.  The classification of the loan as marital in subsection (i) is a conclusion of law, which we review *de novo*.  *See Green*, 255 N.C. App. at 724, 806 S.E.2d at 50.  This conclusion of law must be supported by written findings of

fact. *See Hunt v. Hunt*, 112 N.C. App. 722, 729, 436 S.E.2d 856, 861 (1993).

In his challenge to the findings of fact in subsections (a) through (h), Husband's argument mostly addresses conflicting evidence as to the intentions of the parties, the intentions of the Kellys, and the circumstances of the payment of the $110,000 by the Kellys, but the trial court has the duty to consider the credibility of the evidence and to resolve those conflicts in the evidence. *See Williamson v. Williamson*, 217 N.C. App. 388, 392, 719 S.E.2d 625, 628 (2011) ("Because the trial court is in the best position to weigh the evidence, determine the credibility of witnesses and the weight to be given their testimony, we refuse to re-weigh the evidence on appeal." (quotation marks and brackets omitted)). The trial court found Husband's claims about the loan not to be credible. We cannot second-guess the trial court's finding as to Husband's credibility in finding of fact 170(f). *See id.*

Husband's only specific substantive argument as to a lack of competent evidence supporting finding 170 addresses the reference to the email from the mortgage lender referenced in subsection (e). But even if we were to assume the trial court should have sustained Husband's objection to admission of the email as evidence, and thus the portion of finding 170(e) referring to the contents of the email was not supported by the evidence, the rest of finding 170 is supported by the evidence.

Subsection (h) finds that Husband "ultimately changed his testimony and testified that the $110,000.00 from the Kellys was a loan." This finding is supported

by the evidence. Husband initially testified the $110,000 from the Kellys was a gift, and the parties "[n]ever borrowed" the money. However, during cross-examination, the trial court had to repeatedly remind Husband to answer the questions he was asked. Eventually, after being reminded he was under oath, Husband changed his testimony and testified that he and Wife did, in fact, borrow $110,000 from the Kellys for the purchase of the marital home. Husband then testified that, although he acknowledged the parties borrowed the money, it was his "position that because there was no legal instrument memorializing [the obligation to repay the loan], that [he didn't] have a legal obligation to repay" the $110,000 loan, only a moral obligation to do so.

The remainder of Husband's argument regarding finding of fact 170 addresses the trial court's classification of the payment as a loan, which we review *de novo*. *See Green*, 255 N.C. App. at 724, 806 S.E.2d at 50. Husband, quoting *Geer v. Geer*, argues "[l]oans from close family members must be closely scrutinized for legitimacy." *See Geer v. Geer*, 84 N.C. App. 471, 475, 353 S.E.2d 427, 430 (1987). Husband also argues the "loan" was not "an obligation recognized by law" because there was no written agreement signed by the parties. Husband cites no apposite legal authority to support his argument there must be a written agreement to support a marital debt.[4]

_____

[4] While, as cited by Husband, *Geer* indicates that who is legally liable for a debt is a concern that the trial court must remain cognizant of, *see Geer*, 84 N.C. App. at 475, 353 S.E.2d at 429, we note this Court has declined to extend the rationale in *Geer* and concluded the

- 15 -

The case Husband cites for this proposition, *Lewis v. Lester*, is inapposite; it deals with an agreement to transfer land and states: "It is settled law in North Carolina that an oral contract to convey or to devise real property is void by reason of the statute of frauds (G.S. § 22-2)." *Lewis v. Lester*, 235 N.C. App. 84, 87, 760 S.E.2d 91, 93 (2014).

Further, in *Geer*, the wife argued that "unsecured debts do not qualify as marital property as defined in G.S. 50-20(b)(1) and therefore are not subject to distribution by the court." *Geer*, 84 N.C. App. at 475, 353 S.E.2d at 429. This Court rejected this argument and affirmed the trial court's classification of a debt to the husband's parents as a marital debt. *Id.* at 476, 353 S.E.2d at 430. Indeed, in *Geer*, the evidence supported the trial court's finding that

> the parties borrowed $5,000.00 from defendant's parents in 1970 for the purchase of a mobile home with the promise that it would be repaid with interest. There is also evidence to show that subsequently the parties bought defendant's parents' Peugeot automobile by paying them $800 at the time of the purchase and promising to pay the balance of $3,700.00 plus 6% interest at a later time. *Plaintiff did not deny the existence or amount of the loan from defendant's parents in her testimony.* This evidence is sufficient to support the court's finding that the loans from defendant's parents were legitimate debts and that the value of the two

---

enforceability of a loan is but a distributional factor to be considered in the trial court's discretion. *See Mrozek v. Mrozek*, 129 N.C. App. 43, 47, 496 S.E.2d 836, 839 (1998) ("Plaintiff additionally argues that 'loans from close family members must be closely scrutinized for legitimacy.' However, any concerns the trial court may have with respect to the fact that this marital debt is owed to defendant's parents or that defendant is the sole signatory and may have an affirmative defense to repayment are more properly treated as distributional factors.") (citations omitted)

debts totaled at least $9,000.00, inclusive of interest; therefore, this finding of fact is conclusive on appeal.

*Id.* (emphasis added).

"Marital debt is one incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties." *Comstock v. Comstock*, 240 N.C. App. 304, 317, 771 S.E.2d 602, 612 (2015) (quotation marks omitted). The trial court's findings of fact support its classification of the $110,000 as a marital debt. It was incurred during the marriage and before the date of separation. It was used to purchase the marital home of the parties; this purchase was clearly for the joint benefit of the parties. Husband ultimately admitted that the $110,000 was a loan from the Kellys to purchase the parties' marital home. The trial court did not err by classifying the $110,000 from the Kellys as a loan, not a gift, and a marital debt subject to distribution.

### 2. *Loans to Husband's Colleague*

Husband next purports to challenge findings of fact 181, 184, and 185 as unsupported by competent evidence, but Husband's argument solely focuses on finding of fact 181.[5] *See* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as

---

[5] We also note finding of fact 184 is a conclusion of law that simply states an equal distribution is equitable , *see In re Helms,* 127 N.C. App. 505, 510-11, 491 S.E.2d 672, 675-76 (1997), and finding 185 states the trial court attached and incorporated a chart summarizing the distribution of the parties' property.

abandoned."). Finding of fact 181 states:

> 181. During the marriage, [Husband] loaned money to [Husband's colleague] on two (2) occasions. The total amount loaned to [Husband's colleague] was $15,000.00. [Husband] discussed the first loan with [Wife] and the parties agreed to loan [Husband's colleague] $5,000.00. [Husband] told [Wife] that [Husband's colleague] would repay the money once he was able to. [Husband] did not discuss the second loan of $10,000.00 with [Wife] prior to making the loan to [Husband's colleague]. Both loans were made from [Husband's] SECU Money Market Account # . . . . The Court finds that [Husband's] right to repayment of the $15,000.00 loan to [Husband's colleague] is a marital asset, is valued at $15,000.00, and should be distributed to [Husband].

Husband argues finding of fact 181 is not supported by competent evidence. Similar to the familial loan in finding of fact 170, Husband argues there was insufficient evidence to classify the payment as a loan since there was no written agreement memorializing the debt between the parties and Husband's colleague, and Wife could not testify as to any terms associated with the loan. Husband does not argue that the payments were not made from a marital account or during the parties' marriage.

There is competent evidence in the record to support the trial court's findings regarding the circumstances of the loan to Husband's colleague. Wife testified the parties made two payments to Husband's colleague. Wife testified Husband told her about the first $5,000 payment to Husband's colleague and that she "thought it was a loan . . . . [*She*] *thought* [*Husband's colleague*] *was going to pay it back*." (Emphasis

added.)  When asked whether Husband told her it was a loan, Wife testified she believed he told her that.  Wife also testified Husband did not discuss the second $10,000 payment to Husband's colleague with her, and she was unaware of any "arrangements [Husband] and [his colleague] had with one another about the second $10,000 payment[.]"  Husband did not deny that he paid $15,000 to his colleague, but he testified it was a gift to help fund the colleague's needs and educational expenses, and he never expected his colleague to pay the money back.

Again, the trial court had to make a credibility determination between the parties.  *See Williamson*, 217 N.C. App. at 392, 719 S.E.2d at 628.  The testimony presented as to these payments is more ambiguous than the testimony regarding the loan from the Kellys, but there is nevertheless competent evidence to support the trial court's finding characterizing the payments to Husband's colleague as a loan and not a gift.  There was competent evidence as to the purpose of the payments.  *See generally Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683 (noting competent evidence is needed to support the trial court's findings of fact).  The parties received no property or benefit from the colleague in return for the funds, but based upon Wife's testimony, the payment was a loan and the parties expected the colleague to repay the loan.  Husband's arguments as to the enforceability of the loan, again, do not change the classification of the loan; the enforceability of the loan was but a distributional factor to be considered by the trial court.  *See Mrozek v. Mrozek*, 129 N.C. App. 43, 47, 496 S.E.2d 836, 839 (1998).

### 3. *Charles Schwab IRA*

Husband next argues finding of fact 168 is not supported by competent evidence. Finding of fact 168 states:

> 168. [Wife] is the owner of a Charles Schwab IRA (formerly USAA Traditional IRA . . .), which has marital and separate components. The total balance on the date of separation was $120,253.00. The total current balance is $153,086.00. [Wife] presented compelling, credible evidence tracing the source of funds held in the Charles Schwab IRA, which showed that only twenty nine percent (29%) of the balance of the Charles Schwab IRA is marital and the remaining seventy one percent (71%) is [Wife's] separate property resulting from her employment at the University of Pennsylvania, which ended in 1998. Twenty nine percent (29%) of the current balance of the Charles Schwab IRA equals $44,395, which should be distributed to [Wife]. The remaining balance of $108,691.00 shall be and remain [Wife's] separate property.

First, Husband does not challenge the finding as to the total values of the account. Husband contends there was "insufficient competent evidence" to classify any portion of the IRA as Wife's separate property. We accordingly narrow our review of finding 168 to whether there is competent evidence to support the finding that the account "has marital and separate components." *Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683.

Once again, Husband's primary argument is based mainly upon an objection to introduction of evidence presented at trial which he characterizes as a "letter prepared by her attorney." Wife referred to this letter during her testimony regarding the IRA. When the letter was first mentioned, Husband objected to certain

statements in the letter as hearsay. However, later in the trial, Wife presented additional testimony regarding the letter, as well as the 335 pages of account statements that accompanied the letter, without any objection from Husband. Husband did not renew his objection to any statements in the letter during Wife's extensive testimony regarding her contributions to the IRA prior to and during the marriage at this point in the trial, and he never objected to the account statements with the letter.[6] Husband has therefore waived any argument on appeal as to Exhibit 44. *See generally State v. Shamsid-Deen*, 324 N.C. 437, 445, 379 S.E.2d 842, 847 (1989) ("Any benefit of the prior objection was lost by the failure to renew the objection, and defendant is deemed to have waived his right to assign error to the prior admission of the evidence.").

The trial court's findings are supported by the evidence. Wife testified the funds in the Charles Schwab account began "as a TIAA-CREF account" when she worked at the University of Pennsylvania, prior to the parties' marriage. Wife testified that she made no other contributions after she left the University. Then, in 2010, Wife transferred the balance of the TIAA-CREF account to Fidelity; the entire balance was her separate property. Then, also in 2010, Wife opened up her USAA retirement account and moved the funds in the Fidelity account to the USAA account.

---

[6] When the trial court was reviewing the exhibits which had been admitted later in the trial, Husband again "noted for the record" without elaboration his original objection to the letter in Exhibit 44.

From 2011 through 2018, relatively small, recurring annual transfers were made from the TIAA-CREF account to the USAA account; Wife testified that "the way the contract worked," the TIAA-CREF balance "could only come over in small payments at a time[.]"

Further, Wife then testified while the account was at USAA, and during the parties' marriage, she made contributions to the account. In 2014, Wife transferred her balance from a retirement account she contributed to while working at Novant Health to the USAA account; Wife testified that the Novant Health funds created a marital component in the USAA account. Wife also testified "69 percent of the total deposits were separate, and 29 percent of the total deposits were marital[,]" and that there was an additional 2% separate component from the small, recurring TIAA-CREF transfers. The portions of finding of fact 168 regarding the marital and separate components of the account are supported by competent evidence. *See Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683.

### 4. *Lawsuit Proceeds*

Husband next challenges findings of fact 125 to 141 regarding classification of proceeds of a lawsuit by Husband during the marriage and contends these findings were not supported by competent evidence, but his argument does not actually challenge the findings of fact. Instead, Husband argues the trial court erred by classifying the lawsuit proceeds as marital instead of separate. Since Husband does not challenge the findings of fact, they are binding on this Court. *See Peltzer*, 222

N.C. App. at 787, 732 S.E.2d at 360 (noting unchallenged findings of fact are binding on this Court).

Findings of fact 125 through 141 state:

125. Regarding the legal settlement and [Husband's] contention that the settlement proceeds are his separate property, the Court finds that [Husband] failed to meet his burden to prove that the settlement proceeds are his separate property.

126. [Husband] failed to prove that the settlement proceeds were to compensate for an injury or damages that were personal to him. Instead, the preponderance of the evidence shows that the efforts in the lawsuit were to protect the plaintiffs' income earning abilities while he was married to [Wife].

127. Moreover, the settlement agreement failed to allocate specific amounts for specific types of damage and waived all claims–whether marital or separate.

128. In 2010, [Husband] and three other physicians were dismissed from the American Association of Physician Specialists ("AAPS"). As a result, they retained . . . a law firm in Glen Allen, VA.

129. [Wife] was involved in the discussions with attorneys at [the Virginia law firm], and the other Plaintiffs/physicians in the case. The money [Wife] earned through mEDhealth went to pay legal fees related to [Husband's] dismissal from the AAPS.

130. [The Virginia law firm] referred the case to G. Donovan "Don" Conwell, an attorney in Florida.

131. The Court heard testimony from Attorney Conwell. The Court also heard testimony from Dr. Castillo, who was the lead plaintiff in the lawsuit against the AAPS.

132. Attorney Conwell testified, and the Court so

finds, that one objective of the lawsuit was to reinstate the physicians in the AAPS. To that end, he filed a motion for summary judgment to reinstate the physicians in the AAPS, and the motion for summary judgment was granted. The AAPS appealed, forcing Attorney Conwell and the physicians to defend against the appeal. Attorney Conwell and the physicians prevailed on appeal and were reinstated to the AAPS.

133. Attorney Conwell testified, and the Court so finds, that the lawsuit generally stated a demand for damages for lost income, among other things. The case settled upon a total amount to be paid and split between the four physicians. There was no delineation of the award for different injuries.

134. There was no evidence presented showing that a portion of the settlement was intended to compensate for a particular category or categories of damages.

135. Dr. Castillo testified, and the Court so finds, that as a result of being dismissed from the AAPS, the physicians could not hold themselves out as being board certified by the AAPS, and the lawsuit enabled them to keep their certifications and licenses so that they were able to continue to work and earn an income.

136. The physicians sought an injunction to prevent the loss of their board certification and licensure.

137. The loss of the physicians' board certification would greatly impact their ability to work and earn an income; it would result in the loss of the physicians' ability to practice their respective specialties.

138. Dr. Castillo testified, and the Court so finds, that without the injunction, he would have lost not only his licensure and his ability to serve and practice at his hospital, but the ability to participate with most insurance plans is dependent on licensure.

139. [Husband] received $587,063.63 from the settlement and deposited into his SECU Account # . . . . Of that, $325,463.48 went to reimbursing Dr. Castillo for fronting legal fees for [Husband].

140. Based on the above, [Husband] failed to meet his burden to show that the settlement proceeds are his separate property.

141. However, even if [Husband] had met his burden to show that the settlement proceeds are his separate property, [Husband] failed to trace the funds held in SECU Account # . . . on the date of separation back to the funds received from the legal settlement.

Based upon the findings of fact, Husband and other physicians brought the lawsuit to prevent the loss of their board certification and licensure because the loss of board certification would "greatly impact [their] ability to work and earn an income[.]" Yet Husband's argument on appeal relies upon cases dealing with classification of proceeds from personal injury claims. Husband notes that North Carolina applies the "analytic approach" by focusing on what the proceeds are intended to replace.

> The analytic approach asks what the award was intended to replace, and has been adopted by statute or case law in eight of the nine community property states. Generally, under the analytic approach the personal injury award may be seen as composed of three potential elements of damages: (1) those compensating the injured spouse for pain and suffering, disability, disfigurement, or lost limbs; (2) those compensating for lost wages, lost earning capacity, and medical and hospital expenses; and (3) those compensating the non-injured spouse for loss of services or loss of consortium.

*Johnson v. Johnson*, 317 N.C. 437, 446-47, 346 S.E.2d 430, 435-36 (1986) (brackets in original) (citations and footnotes omitted).

Ignoring the trial court's unchallenged findings regarding the purpose of the lawsuit – to protect Husband's certification to practice and his ability to earn income as a physician – Husband argues "[t]he overwhelming evidence established the primary claim in [the] lawsuit was for defamation – personal injury to [Husband's] reputation and character." Husband points to evidence he presented regarding injury to his reputation and his "emotional distress and mental anguish." But even if the trial court's unchallenged findings were not binding, and even if there was evidence that Husband made claims for "emotional distress and mental anguish," the trial court's findings of fact are supported by competent evidence. *See Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683. The trial court found Husband failed to carry his burden of proving the settlement proceeds were his separate property because he "failed to prove that the settlement proceeds were to compensate for an injury or damages that were personal to him." *See O'Brien v. O'Brien*, 131 N.C. App. 411, 418, 508 S.E.2d 300, 305 (1998) (discussing the parties' "dual burdens of proof" as to classification of marital property).

Contrary to Husband's characterization of his lawsuit, the evidence presented at trial overwhelmingly indicates that the purpose of this suit was to seek an injunction reinstating Husband's status with the professional organization, because without membership and certification by the organization, he would risk loss of his

license and be unable to continue practicing medicine. While the plaintiffs, including Husband, had asserted a claim that included damages for non-economic loss, the claim also asserted damages for economic loss, and the settlement simply grants a sum of money but does not specify for which claims and what type of damages the award is intended to address. Wife testified that this money was acquired during the marriage, and both Wife and Dr. Castillo, a co-plaintiff, testified this lawsuit was to recover compensation for economic loss; these findings are therefore supported by competent evidence. *See generally Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683. Husband's argument is overruled.

### 5. *Credit for Payments Toward Marital Debt*

Husband next argues he was not given proper credit for payments he made to the parties' joint tax liability of $27,000.[7] Husband agreed to pay the parties' 2019 joint income tax liability in the Consent Order, and he asserts he was entitled to a credit for paying Wife's share of the parties' joint 2019 tax liability from his separate property, as the taxes were paid from Husband's SECU account.

Husband's argument is based upon his claim that the funds in the SECU account were his separate property. We have already addressed the classification of

---

[7] We note Husband asserts the Consent Order "required [Husband] to pay the parties' joint tax liability in the amount of $27,087.23." However, the interim distribution order does not state the amount that Husband was required to pay; the order simply states that whatever tax liability resulted from the parties' joint 2019 taxes were to be paid from Husband's SECU account.

the funds in the SECU account as marital; this account held the proceeds of the lawsuit discussed above. Husband contended the proceeds were his separate property, but as addressed above, the trial court properly held the proceeds in the SECU account were marital property. Thus, Husband paid the 2019 tax liability – a marital obligation – from the SECU account and he paid it from marital funds, not from his separate funds. Husband's argument that he did not receive a credit or offset for post-separation payments is without merit. *See generally Bodie v. Bodie,* 221 N.C. App. 29, 34, 727 S.E.2d 11, 15 (2012) ("A spouse is entitled to some consideration, in an equitable distribution proceeding, for any post-separation payments made by that spouse (*from non-marital or separate funds*) for the benefit of the marital estate." (emphasis added) (quotation marks omitted)).

### 6. *Federal Retirement Benefits*

Husband's final argument as to the equitable distribution is that the trial court was without jurisdiction to enter the two orders distributing his federal retirement benefits after his notice of appeal from the First Order, or in the alternative, that these orders violate North Carolina and federal law. We have already addressed Husband's argument regarding jurisdiction of the trial court above; the trial court had jurisdiction to enter the orders under North Carolina General Statute § 50-19.1. *See* N.C. Gen. Stat. § 50-19.1. We have also previously addressed Husband's arguments regarding the substance of the equitable distribution contained in the First Order, and we have affirmed the equitable distribution provisions in the First

Order. The First Order directed the entry of the two retirement plan orders. Husband has not raised any argument that the two retirement plan orders failed to comply with the provisions of the First Order.

Husband's alternative arguments – perhaps they may be better characterized as general statements of objections – regarding the two retirement plan orders are presented in one-half of a page in his brief. These arguments are generally that the two orders "are not supported by competent evidence" and that they do not correctly address any "post separation salary adjustments."

Husband has not identified any specific findings of fact in the two orders he challenges as unsupported by the evidence, nor has he presented any specific argument regarding the conclusions or decrees of the two orders. Husband has consequently waived any challenges to the findings and conclusions in these orders, and we therefore affirm the two orders, Court Order Acceptable for Processing and Retirement Benefits Court Order. *See generally Eaton v. Campbell*, 220 N.C. App. 521, 522, 725 S.E.2d 893, 894 (2012) ("Because defendants' limited and unsupported arguments give us no reason to disturb the trial court's judgment in which its conclusions of law are supported by its findings of fact which are, in turn, supported by the record evidence, . . . we affirm." (citation omitted)).

## IV. Child Support

Husband next challenges the portion of the First Order establishing child support and argues the child support provisions of the First Order should be reversed

because these provisions were "not entered in accordance with the Child Support Guidelines." (Capitalization altered.) For the reasons below, the trial court correctly applied the Child Support Guidelines and did not abuse its discretion.

## A. Standard of Review

Generally, "[c]hild support orders entered by a trial court are accorded substantial deference by appellate courts and our review is limited to a determination of whether there was a clear abuse of discretion." *Ferguson v. Ferguson*, 238 N.C. App. 257, 260, 768 S.E.2d 30, 33 (2014) (quotation marks omitted). "Under this standard of review, the trial court's ruling will be overturned only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *Id.* "The trial court must, however, make sufficient findings of fact and conclusions of law to allow the reviewing court to determine whether a judgment, and the legal conclusions that underlie it, represent a correct application of the law." *Id.*

In a child support proceeding, "our review of the trial court's findings is limited to whether those findings are supported by competent evidence in the record." *Kaiser v. Kaiser*, 259 N.C. App. 499, 510, 816 S.E.2d 223, 231 (2018) (citations omitted). "Findings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if there is evidence to the contrary." *Johnson v. Johnson*, 259 N.C. App. 823, 827, 817 S.E.2d 466, 471 (2018) (quotation marks omitted). Conclusions of law are reviewed *de novo*, and "[i]f the trial court labels a conclusion of law as a finding of fact, the appellate court still employs *de novo* review." *Thomas*

*v. Burgett*, 265 N.C. App. 364, 367, 852 S.E.2d 353, 356 (2019) (citations omitted).

## B. Analysis

Child support is governed by North Carolina General Statute § 50-13.4. *See*

N.C. Gen. Stat. § 50-13.4 (2021). As noted by Husband:

> Payments ordered for the support of a minor child shall be in such amount as to meet the reasonable needs of the child for health, education, and maintenance, having due regard to the estates, earnings, conditions, accustomed standard of living of the child and the parties, the child care and homemaker contributions of each party, and other facts of the particular case.

N.C. Gen. Stat. § 50-13.4(c). Here, child support was determined by "applying the

presumptive [child support] guidelines[,]" N.C. Gen. Stat. § 50-13.4(c), and the trial

court incorporated Worksheet B, calculating child support under the Guidelines, and

attached it to the First Order.[8] *See* N.C. Gen. Stat. § 50-13.4(c1) (requiring the

prescription of "uniform statewide presumptive guidelines for the computation of

child support obligations").

Husband argues the trial court failed to follow the Guidelines and (1) erred in

calculating Wife's gross income, (2) erred by assigning some expenses as childcare

costs, and (3) erred by requiring Husband to pay education expenses. Husband

---

[8] The North Carolina Child Support Guidelines use standardized worksheets to calculate a child support obligation. *See* N.C. Child Support Guidelines, AOC-A-162, at 5 (2020). Worksheet B is published by the North Carolina Administrative Office of the Courts, Form AOC-CV-628. *See* Worksheet B Child Support Obligation Joint or Shared Physical Custody, AOC-CV-628 (2020).

argues these findings, as well as those findings that rely upon the unsupported or erroneous findings, should be vacated and the trial court abused its discretion in entering the child support portion of the Order. For the reasons below, the trial court did not abuse its discretion when entering the child support provisions of the First Order.

### 1. *Wife's Gross Income*

Husband first argues the trial court failed to calculate Wife's gross income, as defined by the Child Support Guidelines. "[D]eterminations of gross income are conclusions of law reviewed *de novo*." *Thomas*, 265 N.C. App. at 367, 852 S.E.2d at 356. The North Carolina Child Support Guidelines define "gross income" as "actual gross income from any source," including "self-employment . . . ownership or operation of a business . . . and annuities." N.C. Child Support Guidelines, AOC-A-162, at 3 (2020). "When income is received on an irregular, non-recurring, or one-time basis, the court may average or prorate the income over a specified period of time[.]" *Id.* Additionally, "[t]he court must determine the parent's gross income as of the time the child support order was originally entered, not as of the time of remand nor on the basis of the parent's average monthly gross income over the years preceding the original trial." *State ex rel. Midgett v. Midgett*, 199 N.C. App. 202, 207, 680 S.E.2d 876, 879 (2009) (citations, quotation marks, and brackets omitted).

The trial court only made one finding regarding Wife's gross income in the First Order: "[Wife] is self-employed as a consultant . . . . She earns a total gross monthly

income of $6,861.25, which is comprised of $6,630.00 wages/salary; $165.00 business income; and $66.25 from cosmetic sales for LimeLife." This finding is consistent with Wife's 4 June 2021 financial affidavit and her testimony at trial. Husband argues the trial court (1) failed to account for pension and annuity payments Wife received in 2020 and (2) failed to make findings regarding ordinary and necessary business expenses from Wife's self-employment income. We first address Wife's pension and annuity payments.

Husband argues the trial court erred because Wife listed $46,512 received as distributions from pensions and annuities on her 2020 individual tax return, which was absent from Wife's 2021 financial affidavit, and the trial court's First Order does not account for any of Wife's pensions and annuities income. Wife's financial affidavit, in and of itself, is competent evidence. *See Rea v. Rea*, 262 N.C. App. 421, 427, 822 S.E.2d 426, 431 (2018) (noting the wife's financial affidavit is competent evidence). As to the $46,512 in annuities Wife claimed on her 2020 taxes, but the trial court did not find as income, Wife testified she "cashed in an annuity in order to pay off some of [her] bills and credit card debt that [she] had as mostly legal fees and some other purchases[.]" Wife testified the $46,512 was withdrawn from a pension retirement account she cashed in to pay her legal bills, and also testified that the $46,512 was "cashed out of [her] IRA[.]" Regardless of the exact account the $46,512 was withdrawn from, there was evidence in the record to show that the $46,512 was a non-recurring, one-time early withdrawal from one of Wife's retirement accounts.

The trial court is not required to treat the conversion of an asset into cash as income for purposes of a child support calculation. Depending upon the evidence in the particular case, the trial court has the discretion to treat a non-recurring, early withdrawal from a retirement account as income for purposes of child support, but here, Husband has failed to demonstrate any abuse of discretion in the trial court's findings as to Wife's income. *See McKyer v. McKyer*, 179 N.C. App. 132, 144, 632 S.E.2d 828, 835 (2006) (applying the 2006 Child Support Guidelines). "[T]he mere fact that a non-recurring payment has occurred, in the absence of evidence that the payment was 'income' at all, is alone insufficient to establish that the payment was necessarily non-recurring income." *Id.* Here, similar to *McKyer*, Husband simply asserts "[t]he trial court did not make findings to reflect how often [Wife] receives such irregular or non-recurring income as required by the guidelines[,]" but Husband "makes no argument as to why receipt of the [payment] constitutes 'income.'" *Id.*

Additionally, although the Guidelines require "current income must be supplemented with copies of the most recent tax return to provide verification of earnings over a longer period[,]" N.C. Child Support Guidelines, AOC-A-162, at 3 (2020), "this Court has established that child support obligations are ordinarily determined by a party's actual income at the time the order is made or modified." *Holland v. Holland*, 169 N.C. App. 564, 568, 610 S.E.2d 231, 234 (2005) (quotation marks and emphasis omitted). Wife's tax return was filed in April 2021, based on her income from the year prior to entry of the First Order. Wife then filed an updated

financial affidavit on 4 June 2021. The hearing on the parties' claims took place 14 June 2021 through 16 June 2021, and the trial court entered its First Order on 8 October 2021.

Here, the trial court had competent evidence of Wife's income in 2021 available, and the trial court did not err by utilizing the most recent figures from the current year to calculate Wife's income. *See Rea*, 262 N.C. App. at 427, 822 S.E.2d at 431; *Holland*, 169 N.C. App. at 568, 610 S.E.2d at 234. The trial court did not err by entering a finding without accounting for Wife's retirement withdrawal when the trial court applied the Guidelines, using Wife's current income, because "[u]nder the Child Support Guidelines, [c]hild support calculations . . . are based on the parents' current incomes at the time the order is entered." *Midgett*, 199 N.C. App. at 207, 680 S.E.2d at 879 (quotation marks and emphasis omitted). Husband's arguments as to the trial court's treatment of Wife's early retirement withdrawal are overruled.

Husband also argued the trial court erred in determining Wife's gross income by "failing to make findings regarding the 'ordinary and necessary' expenses incurred for self-employment or operation of a business." The Guidelines define "[g]ross income from self-employment . . . as gross receipts minus ordinary and necessary expenses required for self-employment or business operation." N.C. Child Support Guidelines, AOC-A-162, at 3 (2020). "Expense reimbursements or in-kind payments . . . received by a parent in the course of employment, self-employment, or operation of a business are counted as income if they are significant and reduce personal living

expenses." *Id.*

Husband asserts the trial court failed by making findings as to Wife's "ordinary and necessary" business expenses because Wife paid for "regular business expenses like internet, phone, [her] computer, support, and some legal fees" through her business but the trial court made "no findings regarding the reasonableness of these expenses in the determination of [Wife's] income." Husband notes "the trial court received substantial evidence regarding mEDhealth's profits and losses" upon which such findings could be made. However, Husband does not clearly articulate an argument. Husband does not identify any specific unreasonable expense the trial court might have disregarded nor does he state how the trial court should have treated any specific expense.

Additionally, Husband's argument is somewhat baffling, since Wife's gross income would be reduced by deduction of these alleged business expenses from her business income, leaving Wife with a lower income for purposes of the child support obligation. A lower income would simply *reduce* Wife's share of the child support obligation and *increase* Husband's child support obligation based upon the percentage of the total child support obligation assigned to Husband. Here, Husband notes the trial court "received substantial evidence" of Wife's self-employment income and simply points to the absence of findings to assert the trial court erred. But "the trial court need not make a finding as to every fact which arises from the evidence." *Matter of M.S.E*, 378 N.C. 40, 54, 859 S.E.2d 196, 209 (2021). The trial court made sufficient

ultimate findings of fact as to the parties' incomes as needed to calculate Guideline child support. In this case, there is no indication that either party requested to deviate from the Guidelines, and the trial court did not do so *sua sponte*. As a result, the trial court was not required to make findings on Wife's reasonable expenses arising from her self-employment as they relate to her income and relative ability to pay child support. *See generally Ferguson*, 238 N.C. App. at 260-61, 768 S.E.2d at 33-34. The trial court made the required finding as to Wife's gross income based upon the evidence. *See* N.C. Child Support Guidelines, AOC-A-162, at 3 (2020). Husband's argument that the trial court erred by failing to make findings regarding Wife's business expenses and the impact of these expenses on her income is overruled.

### 2. *Work-Related Child Care Costs*

Husband next argues the trial court "erred in allocating summer camp expenses as work-related child care costs[,]" (capitalization altered), because there was evidence in the record indicating not all of Wife's claimed child care expenses "had any relationship to her employment responsibilities." Husband asserts, therefore, "[t]he trial court's inclusion of summer camp expenses was not in accordance with the child support guidelines and constitutes an abuse of discretion." We disagree.

"Reasonable child care costs that are, or will be, paid by a parent due to employment or job search are added to the basic child support obligation and prorated between the parents based on their respective incomes." N.C. Child Support

Guidelines, AOC-A-162, at 4 (2020). The trial court found Wife "ha[d] a monthly work-related childcare cost of $386.58" and entered an adjustment to Worksheet B for these expenses when determining the parties' child support obligation under the Guidelines.

This finding is supported by competent evidence. Wife's June 2021 financial affidavit is included in the record. In this affidavit, Wife attested that her monthly work-related childcare costs averaged over a full year were $386.58 per month. Wife also testified that these figures were calculated based on David's usual after-school care and "the average of all of" the summer camps David participates in "because they're all different prices." Wife then testified that she uses after-school childcare and summer camps to facilitate meeting her professional obligations. Wife testified that David "goes to summer camp so that [she] can work, [and] so that he can have a camp experience." When questioned whether "[t]he summer camp has nothing to do with childcare so you can perform your work responsibilities, correct[,]" Wife answered "[n]o. It has something to do with it, but it also has to do with [David] wanting/needing those same activities, just like lots of kids, activities for growth and opportunity, being with friends, learning new skills, whatever it is." Wife continued "[a]nd *I also would not be able to work and bring in the income, which would then just decrease my income and increase* [*Husband's*] *need to support us*." (Emphasis added.)

Wife's financial affidavit and her testimony are competent evidence to support the trial court's finding that Wife has $386.56 in "monthly work-related childcare

cost[s,]" *see Rea*, 262 N.C. App. at 427, 822 S.E.2d at 431, and "[f]indings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if there is evidence to the contrary." *Johnson*, 259 N.C. App. at 827, 817 S.E.2d at 471. Husband's argument is overruled.

### 3. *Private School Tuition and Expenses*

Husband next argues the trial court made insufficient findings regarding tuition expenses, including that the trial court failed to make a finding accounting for increases in tuition and failed to make a finding regarding registration and institution fee expenses. Husband also argues the trial court did not explain why he "should be solely responsible for these costs or provide analysis of this shared expense between the parties." For the reasons below, Husband's argument does not have merit.

The trial court found "the minor child attends school . . . at a cost of $1,211.25 per month. This is a reasonable extraordinary expense for the minor child. [Husband] should continue to pay the minor child's private school tuition expense at" the child's school. The trial court included this expense in the Child Support Guidelines Worksheet attached to the First Order. The trial court then ordered Husband to pay "monthly school tuition (including the registration and institution fee expenses) directly to the minor child's school."

The Child Support Guidelines provide for extraordinary expenses:

Other extraordinary child-related expenses (including (1)

> expenses related to special or private elementary or
> secondary schools *to meet a child's particular education
> needs . . .* ) may be added to the basic child support
> obligation and ordered paid by the parents *in proportion to
> their respective incomes if the court determines the expenses
> are reasonable, necessary, and in the child's best interest.*

N.C. Child Support Guidelines, AOC-A-162, at 5 (2020) (emphasis added). "According

to the child support guidelines, the trial court may make adjustments for

extraordinary expenses and order payments for such term and in such manner as the

court deems necessary." *Ferguson*, 238 N.C. App. at 265, 768 S.E.2d at 36 (quotation

marks and brackets omitted). The trial court has the authority to add extraordinary

expenses to the basic child support obligation set under the Guidelines and prorate

these expenses based on the parties' incomes, so long as the trial court determines

the expenses "are reasonable, necessary, and in the child's best interest." *Id.*

(quotation marks and citation omitted). Adjustments for extraordinary expenses are

not deviations from the Guidelines, and therefore, "absent a party's request for

deviation, the trial court is not required to set forth findings of fact related to the

child's needs and the non-custodial parent's ability to pay extraordinary expenses."

*Id.* (quotation marks omitted).

The trial court found "[i]t is in [David's] best interests that he continues to

attend [his current school][,]" and Husband does not challenge the trial court's

findings regarding his current school. The trial court found David had attended his

private school since kindergarten, the parties agreed he should continue to attend the

school, and the school's religious values motivated their decision to send David to that school. David was "thriving" at this school and "has established strong, close relationships with his teachers and peers." Consistent with the Guidelines, the trial court added David's education expenses to the basic child support obligation on Worksheet B and prorated those expenses based on the parties' respective incomes. *See* N.C. Child Support Guidelines, AOC-A-162, at 5 (2020).

The trial court did not abuse its discretion by not making a finding regarding any increase in tuition. Any increase in tuition, should it occur, may be addressed in a future proceeding upon a motion to modify Husband's support obligation. *See* N.C. Gen. Stat. § 50-13.7 (2021). Additionally, we cannot determine the basis of Husband's argument the trial court failed to make specific findings regarding "registration and institution fee expenses." As best we can tell from the record, the bill for tuition from the school includes various fees, and some of those fees are characterized as registration and institution fees, but it is not clear what amount of fees Husband is responsible for, or how often those fees are due. Finding 60 states that "the minor child attends school at [name of school redacted] at a cost of $1,211.25 per month." Husband did not challenge this finding of fact, and it is binding on appeal. *See Peltzer*, 222 N.C. App. at 787, 732 S.E.2d at 360. This argument is without merit.

As to Husband's argument that the trial court did not explain why he "should be solely responsible for these costs or provide analysis of this shared expense between the parties[,]" Husband's argument shows a misunderstanding of the effect

of the calculations on Child Support Guidelines Worksheet B. Husband is not "solely responsible" for the tuition costs, and the Worksheet itself is an "analysis of this shared expense between the parties." Additionally, Husband does not challenge the use of Worksheet B to calculate his support obligation.

On Worksheet B, the parties' total support obligation was "adjust[ed]" by $1,211.25 for private school "expenses paid directly by" Husband. Worksheet B accounts for the total child support obligation and the percentages owed by each party, based upon their individual incomes and the custodial time with the child, and prorates the parties' obligations based upon their share of their total income, including adjustments for expenses paid for both parties. Here, the trial court included adjustments for $386.58 per month in "[w]ork-related child care costs" to be paid by Wife, $244.21 per month in "[h]ealth [i]nsurance premium costs – child's portion" to be paid by Husband, and, as an extraordinary expense, $1,211.25 per month in tuition costs to be paid by Husband.

The calculation of child support accounted for the allocation of all these expenses paid by both parties, based upon their respective percentage responsibility for the total support obligation. Consequently, the Worksheet accounts for the full $1,211.25 per month paid by Husband for David's education costs, prorates it between the parties based on their income, and Husband's ultimate child support obligation takes into account the expenses he pays. The trial court did not abuse its discretion in utilizing Worksheet B or its calculation for child support, and Husband's argument

is without merit.

## V.   Alimony

We next address Husband's challenge to the portion of the First Order establishing alimony.   Continuing his blunderbuss approach, Husband purports to challenge nearly every potential aspect of the alimony award:    the findings of fact the trial court made; the findings of fact the trial court did not make; Wife's status as a dependent spouse; the parties' accustomed standard of living; Wife's current income and expenses; the possibility that Wife may earn a greater income in the future; the trial court's consideration of factors under North Carolina General Statute § 50-16.3A; and of course the amount of alimony awarded.   To the extent we can separate the wheat from the chaff, we will address the arguments properly presented.

### A.  Standard of Review

Husband's arguments address both entitlement and the amount of alimony the trial court awarded.   "[A]limony is comprised of two separate inquiries[,]" whether a spouse is entitled to alimony and if so, the amount.   *Barrett v. Barrett*, 140 N.C. App. 369, 371, 536 S.E.2d 642, 644 (2000).

"[W]hen the trial court sits without a jury, the standard of review on appeal is whether . . . competent evidence . . . support[s] the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." *Collins v. Collins*, 243 N.C. App. 696, 699, 778 S.E.2d 854, 856 (2015) (ellipses and brackets in original) (citations and quotation marks omitted).   "If the court's findings of fact are supported

by competent evidence, they are conclusive on appeal, even if there is contrary evidence." *Id.* "The trial court's unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal." *Peltzer*, 222 N.C. App. at 787, 732 S.E.2d at 360.

"Whether a spouse is entitled to an award of alimony or post-separation support is a question of law. This Court reviews questions of law *de novo*. Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *Collins*, 243 N.C. App. at 699, 778 S.E.2d at 856 (citations and quotation marks omitted).

> Decisions regarding the amount of alimony are left to the sound discretion of the trial judge and will not be disturbed on appeal unless there has been a manifest abuse of that discretion. When the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. An abuse of discretion has occurred if the decision is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.

*Kelly v. Kelly*, 228 N.C. App. 600, 601, 747 S.E.2d 268, 272-73 (2013) (citations and quotation marks omitted).

## B. Status of Wife as Dependent Spouse

We have grouped Husband's arguments based on the findings his arguments address.

### 1. Findings Regarding the Parties' Accustomed Standard of Living and Wife's Reasonable Needs

Husband first contends Wife "is not a dependent spouse because she is not actually and substantially dependent upon [Husband] for her maintenance and support." (Capitalization altered.) But there are two types of dependent spouses; a dependent spouse is one "who is actually substantially dependent upon the other spouse for his or her maintenance and support or is *substantially in need of maintenance and support* from the other spouse." N.C. Gen. Stat. § 50-16.1A(2) (2021) (emphasis added). "A party is 'actually substantially dependent' upon her spouse if she is currently unable to meet her own maintenance and support." *Carpenter v. Carpenter*, 245 N.C. App. 1, 4, 781 S.E.2d 828, 832 (2016) (quoting *Barrett*, 140 N.C. App. at 370, 536 S.E.2d at 644). "A spouse is 'substantially in need of maintenance' if he or she will be unable to meet his or her needs in the future, even if he or she is currently meeting those needs." *Barrett*, 140 N.C. App. at 371, 536 S.E.2d at 644-45.

Husband first contends the "trial court did not make factual findings regarding the parties' accustomed standard of living during the marriage." (Capitalization altered.) Husband also contends that the "trial court's findings related to [Wife's] dependency and the parties' expenses are not supported by competent evidence. Findings of fact 68 through 88 should be vacated." Thus, Husband claims the trial court did not make sufficient findings of fact regarding the parties' standard of living

during the marriage while *also* claiming that the trial court's findings of fact addressing exactly that should be vacated. Essentially, Husband seems to contend the trial court should have been more specific as to the details of the parties' accustomed standard of living during the marriage as opposed to their current needs and expenses.

Findings of fact 68 through 79 address the parties' income and expenses. We will not quote these findings, which are highly detailed findings, including several tables summarizing the reasonable expenses for each party and the child, contained in two single-spaced pages of the order. Husband does not articulate any specific argument challenging any of these findings as unsupported by the evidence, and therefore they are binding on appeal. *See Peltzer*, 222 N.C. App. at 787, 732 S.E.2d at 360. The trial court also made extensive, detailed findings regarding the parties' property and financial circumstances during the marriage in the portion of the First Order addressing equitable distribution. Those findings address the parties' marital home, vehicles, bank accounts, retirement plans, jewelry, art collection, household goods, debts, life insurance policies, business interests, credit cards, and frequent flyer miles. Clearly, the trial court considered all these findings in coming to its evaluation of the accustomed standard of living and its conclusion regarding Wife's status as a dependent spouse.

## 2. *Findings Regarding Wife's Capacity to Earn Future Income*

Husband also contends the trial court "failed to make any findings regarding

[Wife's] capacity to earn future income." First, the trial court need not make specific findings regarding capacity to earn income unless a spouse is suppressing her income in bad faith and the court imputes income. *See Kowalick v. Kowalick*, 129 N.C. App. 781, 787, 501 S.E.2d 671, 675 (1998) ("Alimony is ordinarily determined by a party's *actual* income, from all sources, at the time of the order. To base an alimony obligation on earning capacity rather than actual income, the trial court must first find that the party has depressed her income in bad faith." (emphasis in original) (citation omitted)). The trial court's findings show Wife was appropriately and gainfully employed and there was no basis for imputation of income. In addition, the trial court made the following findings addressing Wife's work history and future earning potential, and these findings are supported by the evidence:

> d.     For the majority of the parties' marriage, [Wife] made substantial sacrifices that advanced [Husband's] career and increased his earning capacity. [Wife] agreed to relocate many times for [Husband's] career even though she was required to find a new employment as a result of the relocations. In addition to agreeing to relocate, [Wife] assisted [Husband] in editing his journal articles and reviewing documents for his articles and research. [Wife] took care of the household and the minor child while [Husband] attended numerous conferences and meetings. All of these contributions increased [Husband's] income and earning capacity.
>
> e.     [Wife] sacrificed her career to a large extent to care for the household and the minor child. The parties agreed that [Wife] would work part-time in order to be the primary caretaker for the minor child.
>
> f.     [Husband] has a higher income than [Wife].

His earning capacity will remain the same or increase.

> g.      [Wife] cares for the parties' child the majority of the time. [Wife's] earning capacity is limited due to her role as the primary caregiver for the minor child. [Wife] could not increase her income without traveling and increasing her work hours, which she cannot do as long as she . . . is the minor child's primary caregiver.

> h.      [Wife] is 47 years old. Her earning capacity will likely stay the same with a *potential* to increase once the minor child is sixteen (16) years old and takes on more responsibility for his care and transportation.

(Emphasis in original.) The trial court addressed the proper factors, based upon the evidence. *See* N.C. Gen. Stat. § 50-16.3A (2021).

The trial court made sufficient findings of fact regarding the parties' accustomed standard of living during the marriage as well as Wife's current reasonable needs for support, and Wife's capacity to earn future income. These findings are supported by the evidence. This argument is without merit.

### 3. *Marital Misconduct*

The trial court made detailed findings regarding the alimony factors stated in North Carolina General Statute § 50-16.3A. *See* N.C. Gen. Stat. § 50-16.3A(b). As noted above, Husband has generally challenged all the findings regarding the alimony factors as unsupported by the evidence, but he does not make a specific argument on most of them, so we will not address those factors. Husband *does* address the trial court's findings as to marital misconduct in detail.

Husband purports to challenge "[f]indings of fact 40 through 43, 46, 79, 84, and

152" and argues "[t]he evidence regarding marital misconduct was pure conjecture and all attendant findings should be vacated." We preliminarily note findings 40 through 43 were in the section of the First Order addressing child custody, and although Husband nests additional arguments here, including challenging various statements of the minor child as hearsay, we need not address his evidentiary arguments because as relevant to alimony, these findings all address Husband's credibility, or lack thereof, and even if we disregard findings 41 through 43, the trial court's other findings make its assessment of Husband's lack of credibility abundantly clear. For purposes of Husband's argument as to entitlement to alimony, we do not address these findings.

The challenged findings state in relevant part:

> 79.   In determining the amount, duration, and manner of payment of alimony, the Court finds, in addition to the above findings, as follows:[9]
>
> . . . .
>
> i.   [Wife] was a faithful and dutiful wife, who supported and loved [Husband] through a difficult revelation in their marriage.

---

[9] The majority of finding of fact 79 has nothing to do with marital misconduct, and instead simply recounts evidence regarding the length of the marriage, how much the parties worked, and the disparity in the parties' income. These are factors the trial court was required to consider in determining whether Wife was entitled to alimony and the amount of alimony she was entitled to receive. *See* N.C. Gen. Stat. § 50-16.3A(a)-(b). Husband's argument focuses on the challenges quoted here; Husband does not articulate an argument against the omitted findings and they are binding on appeal. *See Peltzer*, 222 N.C. App. at 787, 732 S.E.2d at 360; *see also* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

j.      [Wife] did not commit marital misconduct.

k.      [Husband] has committed acts of "marital misconduct" as that term is defined in N.C.G.S. § 50-16.1A(3)(a) and (f). Specifically: [Husband] committed acts of illicit sexual behavior with at least one woman other than [Wife] during the parties' marriage. [Husband] wasted marital assets for non-marital purposes in furtherance of his illicit sexual activities as detailed further in Finding of Fact 152, below.

l.      [Wife] did not condone [Husband's] illicit sexual behavior or other marital misconduct as described herein.

m.      [Husband's] marital misconduct set forth above rendered the condition of [Wife] intolerable and her life burdensome.

. . . .

152.    [Wife] analyzed the expenditures from [Husband's] USAA Checking Account # . . . and presented evidence of [Husband's] marital waste.  [Husband] spent substantial sums of money for non-marital purposes, including but not limited to, lingerie and sex store purchases for individuals other than [Wife]; pornography; numerous hotel charges; PayPal charges to at least one female, for sex; spyware that he installed on [Wife's] phone; charges for a secret email account; numerous background checks for potential sexual partners; Match.com; among other similar expenditures for non-marital purposes.

In addition to the challenged findings, the trial court made two findings relevant to

Husband's marital misconduct that Husband does not challenge:

153.    Of the $123,869.00 that [Husband] claimed was used for home improvements, only $29,603.00 was used for home improvements.

154.   Accordingly, $29,603.00 was used for marital purposes and should be distributed equally to the parties. The remainder was used by [Husband], for non-marital purposes in furtherance of his illicit extramarital activities and should be distributed to [Husband].

Husband's argument focuses mostly on the finding of illicit sexual behavior, finding 79(k).

Marital misconduct may be a factor considered by the trial court in determining alimony, *see* N.C. Gen. Stat. § 50-16.3A(b)(1), but "[i]f the court finds that the supporting spouse participated in an act of illicit sexual behavior, as defined in G.S. 50-16.1A(3)a., during the marriage and prior to or on the date of separation, then the court *shall* order that alimony be paid to [the] dependent spouse." N.C. Gen. Stat. § 50-16.3A(a) (emphasis added). "Illicit sexual behavior" is distinguished from other forms of marital misconduct as it mandates an award of alimony to a dependent spouse, whereas other forms of marital misconduct may simply be considered as a factor, in the trial court's discretion, in determining alimony. *See Romulus v. Romulus*, 215 N.C. App. 495, 521-22, 715 S.E.2d 308, 325 (2011); *see also* N.C. Gen. Stat. § 50-16.3A(b)(1).

Here, the trial court found Husband had committed both illicit sexual behavior and indignities. As noted above, Husband's marital misconduct under Subsection 50-16.1A(3)a. mandates an award of alimony, but indignities under Subsection 50-16.1A(3)f. is a factor the trial court may consider when determining entitlement to alimony. *See* N.C. Gen. Stat. § 50-16.3A(a).

Husband's main argument here centers on finding 79(k). Husband argues Wife "had no personal knowledge of any fact found by the trial court regarding illicit sexual activity by [Husband]" and that she "could not identify any individual with whom [Husband] had the relationship." Wife counters by noting the evidence of Husband's tremendous expenditures for lingerie, sex toys, hotels, pornography, "SmartSextalk," secret emails, a subscription to Match.com, and online payment to someone named "Jenna." Wife relies upon *Rea v. Rea*, which states that "[i]t is well-established that direct evidence of illicit sexual behavior or indignities as a result of that behavior is not required but can be shown by circumstantial evidence." *Rea*, 262 N.C. App. at 424, 822 S.E.2d at 429. This case has different facts from prior cases, such as *Rea*, addressing the sufficiency of circumstantial evidence under the "opportunity and inclination" doctrine to support a finding of "illicit sexual behavior," so we must consider if the evidence in this case will also suffice to support the trial court's findings.

In *Rea*, this Court explained,

> Where adultery is sought to be proved by circumstantial evidence, resort to the opportunity and inclination doctrine is usually made. Under this doctrine, adultery is presumed if the following can be shown: (1) the adulterous disposition, or inclination, of the parties; and (2) the opportunity created to satisfy their mutual adulterous inclinations.
>
> Thus, if a plaintiff can show opportunity and inclination, it follows that such evidence will

> tend to support a conclusion that more than
> mere conjecture exists to prove sexual
> intercourse by the parties.

*Coachman v. Gould*, 122 N.C. App. 443, 447, 470 S.E.2d
560, 563 (1996) (citation and quotation marks omitted).

The evidence at trial included a private investigator
("PI") who testified that on 6 August, before separation, she
witnessed and photographed Husband kissing Ms. Smith.
The investigative report, admitted as an exhibit, shows
that the investigator parked near Husband's truck in the
parking lot of a shopping mall at 1:09 p.m. and waited until
3:45 p.m., when Husband and Ms. Smith arrived, and Ms.
Smith parked her car next to Husband's truck. Husband
and Ms. Smith kissed. Husband then got into his own
truck, and both vehicles left at the same time. Thereafter,
on 18 and 19 August, two nights in a row only ten days
after the parties' separation, the PI saw Husband's and Ms.
Smith's vehicles parked overnight at a hotel. Although the
overnight stays at the hotel were shortly after the parties
separated, "[n]othing herein shall prevent a court from
considering incidents of post date-of-separation marital
misconduct as corroborating evidence supporting other
evidence that marital misconduct occurred during the
marriage and prior to date of separation[.]" N.C. Gen. Stat.
§ 50-16.3A(b)(1) (2015).

Furthermore, Wife testified that prior to their
separation Husband began to repeat specific suspicious
behaviors he exhibited in 2011 when he had a prior affair;
these actions prompted her to hire the PI. For example,
Husband failed to come home one night. Wife also saw
Husband and Ms. Smith together, including at Husband's
temporary residence, shortly after the date of separation,
and when Wife confronted the Husband about the other
woman, he said, "she was a better woman than" Wife. We
conclude there was competent evidence to support finding
of fact 11(a) and (b). This argument is overruled.

*Id.* at 424-25, 822 S.E.2d at 429-30 (formatting altered).

In *Rea*, there was evidence the husband was having a relationship with a specific woman, Ms. Smith. *See id.* The two of them were observed together overnight at a hotel twice. *See id.* Other cases using the "opportunity and inclination" doctrine present similar facts. *See, e.g.*, *Wallace v. Wallace*, 70 N.C. App. 458, 319 S.E.2d 680 (1984); *Horney v. Horney*, 56 N.C. App. 725, 289 S.E.2d 868 (1982); *Owens v. Owens*, 28 N.C. App. 713, 222 S.E.2d 704 (1976).

The statutory definition of "illicit sexual behavior" is quite specific:

> Illicit sexual behavior. For the purpose of this section, illicit sexual behavior means acts of sexual or deviate sexual intercourse, deviate sexual acts, or sexual acts defined in G.S. 14-27.20(4), voluntarily engaged in by a spouse with someone other than the other spouse[.]

N.C. Gen. Stat. § 50-16.1A(3)a. The term "sexual act" as used in this context is also specifically defined, by reference to North Carolina General Statute § 14-27.20(4):

> (4) Sexual act. — Cunnilingus, fellatio, analingus, or anal intercourse, but does not include vaginal intercourse. Sexual act also means the penetration, however slight, by any object into the genital or anal opening of another person's body. It is an affirmative defense that the penetration was for accepted medical purposes.

N.C. Gen. Stat. § 14-27.20 (2021).

Some of the terms of North Carolina General Statute § 50-16.1A are not so well-defined. For example, "deviate sexual acts" apparently means something other than the "sexual acts" as defined by North Carolina General Statute § 14-27.20(4),

but no case has explained exactly what it is.[10]   In this case, the facts of the "opportunity" and "inclination" do not present the traditional situation with evidence of someone observing an overnight stay at a hotel or residence, *see Rea*, 262 N.C. App. at 424, 822 S.E.2d at 429, but the circumstantial evidence of Husband's illicit sexual behavior is still compelling.  Finding 152 summarizes this extensive evidence:

> 152. [Wife] analyzed the expenditures from [Husband's] USAA Checking Account . . . and presented evidence of [Husband's] marital waste. [Husband] spent substantial sums of money for non-marital purposes, including but not limited to, lingerie and sex store purchases for individuals other than [Wife]; pornography; numerous hotel charges; ATM withdrawals of large sums of cash that lined up with the hotel charges; PayPal charges to at least one female, for sex; spyware that he installed on [Wife's] phone; charges for a secret email account; numerous background checks for potential sexual partners; Match.com; among other similar expenditures for non-marital purposes.

Taking all these purchases in context, along with the testimony of both Husband and Wife about their relationship and the circumstances of Husband's many

---

[10] In *Haddon v. Haddon*, it seems the alleged "deviate sexual acts" were between the husband and the wife, not with a third party, but we do not know what they did as the Court was apparently too appalled by the evidence to describe it:

> Evidence of abnormal and unnatural sexual conduct was offered by both plaintiff and defendant. There was conflicting evidence on the question of whether such conduct was abhorrent and intolerable to the plaintiff. However, the plaintiff did offer abundant evidence that defendant's persistent sexual conduct was intolerable to her and that she was forced against her will to engage in them with defendant.

*Haddon v. Haddon*, 42 N.C. App. 632, 635, 257 S.E.2d 483, 485 (1979).

nights away in hotels, a permissible inference for the trial court to make from Husband's "opportunity and inclination" to commit illicit sexual behavior was to find Husband had committed illicit sexual behavior with at least one woman during the marriage. The evidence of Husband's activities was circumstantial, but the trial court properly considered the weight of the evidence and made findings of fact which are supported by this evidence. The evidence showed "inclination" to engage in sexual activity with other women, as demonstrated by the online services and purchases of lingerie and sex toys not used with Wife, as well as "opportunity" for sexual activities with the many hotel nights which corresponded with the dates of cash withdrawals and other purchases. *See Rea* 262 N.C. App. at 424-25, 822 S.E.2d at 429-30. There was evidence of a PayPal payment "for sex" to "at least one female." Further, the evidence showed that some of the online services used by Husband are specifically intended to allow customers to contact women for the purpose of arranging sexual encounters. Husband did background checks on "potential sexual partners." Husband spent nearly $100,000 on these purchases, including hotels, lingerie, and sex toys. The large ATM withdrawals of cash matched up to the nights of the hotel charges. Although caselaw discussing inclination and opportunity warns against application of the doctrine where the evidence might only support a conjecture "that an adulterous affair had taken place[,]" in this case the evidence supports a reasonable inference of both Husband's opportunity and inclination to engage in illicit sexual behavior during the parties' marriage. *See Wallace*, 70 N.C. App. at 461-62,

319 S.E.2d at 682-83 (citation omitted); *see also Coachman v. Gould*, 122 N.C. App. 443, 446-47, 470 S.E.2d 560, 563 (1996).

There was competent evidence to support the trial court's finding that Husband engaged in illicit sexual behavior during the marriage. Additionally, Husband did not articulate an argument against the trial court's finding Husband committed indignities and his "marital misconduct set forth above rendered the condition of [Wife] intolerable and life burdensome[,]" so this finding of fact is binding on appeal. *See* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."). While indignities do not mandate an award of alimony as illicit sexual behavior does under North Carolina General Statute § 50-16.3A(a), the trial court's findings also support the trial court's conclusions that "[a]n award of alimony from [Husband] to [Wife] is equitable" and "[Wife] is entitled to an award of alimony from [Husband]." *See* N.C. Gen. Stat. § 50-16.3A(a) ("The court shall award alimony to the dependent spouse upon a finding . . . that an award of alimony is equitable after considering all relevant factors, including those set out in subsection (b) of this section."), *see also* N.C. Gen. Stat. § 50-16.3A(b)(1) (requiring the trial court to consider marital misconduct as an equitable factor in establishing entitlement and amount of alimony). We therefore affirm the First Order regarding alimony.

## VI. Conclusion

We affirm the First Order as to the equitable distribution of the parties'

property as well as the trial court's two orders regarding retirement, Court Order Acceptable for Processing and Retirement Benefits Court Order distributing Husband's federal retirement plans. We also conclude the trial court did not abuse its discretion when applying the Child Support Guidelines and affirm the First Order as to the trial court's child support determination. As to the portion of the trial court's First Order awarding alimony, we conclude the evidence supports the trial court's finding that Husband committed "acts of illicit sexual behavior with at least one woman" other than Wife during the marriage and the trial court's findings also support the trial court's conclusion that an award of alimony was equitable. The trial court did not err in finding Husband committed marital misconduct, did not err in determining Wife was entitled to alimony, and did not abuse its discretion in awarding alimony to Wife. The alimony provisions of the First Order are also affirmed.

AFFIRMED.

Judges ZACHARY and COLLINS concur.